May it please the Court, Kevin Ross for the Appellant, Melvin Coleman. Your Honors, I'm here today on the question of three issues that were raised in the brief, two of which I will spend some time on, is whether or not the District Court erred in denying Mr. Coleman's motion to suppress, and then subsequently whether the District Court erred in denying Mr. Coleman's motion for new trial under Rule 33, which is basically the same argument, the same facts and law as was the motion to suppress. Your Honor, the District Court, let me backtrack, the Trial Counsel failed to file the motion to suppress timely, and so what ended up happening at trial is the Trial Counsel filed a motion in limine, which was basically the same argument as the motion to suppress. The District Court judge, though she could have determined not to hear it at all as untimely, decided to hear the argument, and in the course of the argument, she made a determination that Mr. Coleman was not in custody at the time he made the statements, which we'll go into in just a moment, and that if he did, the statement was voluntary. Your Honors, because the District Court heard the motion to suppress via a motion in limine, this Court can hear the merits of the case. If the Court is going to look at the standard of review as clearly erroneous under findings of fact and questions of law de novo, or even plain error, we would submit that the District Court erred, and here's why. First of all, Mr. Coleman, there was an investigation that had been going on in regards to Mr. Hare, the co-defendant in this case. Mr. Coleman was not on the investigators' police radar at all during this investigation until May 13th of 2011, when the DPS agents had been investigating and knew that Mr. Hare was going to be coming back, traveling to Texas. They saw another car traveling with Mr. Hare and believed that, well, they're traveling in tandem, and so they may be associated with one another, so the DPS agent contacted local police authorities to pull the white Explorer over to come up with some reason to pull him over, which they did, and the reason that they did was because of a lane change signal and also because of following too close. Basically a pretextual stop. Well, you're not complaining about that here now, are you? I'm not complaining about that, Your Honor, but just giving some context. So what ends up happening, though, the officer, Rosamond, who makes this stop, has previous information. He knows that they think that whoever is driving the white Explorer, who turns out to be Mr. Coleman, is either trafficking in narcotics or large sums of money from drug dealing. So he pulls, let's jump to the stop, pulls him over. Perfectly legitimate traffic stop under the law. Mr. Coleman is then asked by the officer, license, registration, where are you coming from, no problems there. Perfectly okay. For the first seven minutes, nothing's awry here. He then goes back and checks Mr. Coleman's license and finds out that there's a warrant seven minutes into the stop. Now remember, the stop is for what? A violation of a lane change, no signal, and following too close. On an ordinary traffic stop, that should be dispelled very, very quickly as far as an investigative detention. Dispelled very quickly. Less than seven minutes? I'm sorry, your honor? Are you arguing less than seven minutes? I'm arguing within that seven minute time period. So I'm going back to the reasonable person argument, your honor, who's neutral, right? So a reasonable person is pulled over by an officer, believes, hey, this is a traffic stop, okay, I'm going to be here for a few minutes, law says no problem. Officer Rosamond goes back, finds that there is a warrant for Mr. Coleman, and asks Mr. Coleman to step out of the vehicle. So Mr. Coleman now is out of the vehicle, and Officer Rosamond continues to ask some questions of him. Now, interestingly, when this is happening, your honor- Officer Rosamond. No, your honor, I disagree. I disagree. When he is pulled out of the vehicle, and several more minutes have transpired, Officer Rosamond, A, knows that there's a warrant, right? So Mr. Coleman is not free to leave. I mean, if there's a warrant out, Mr. Coleman's not going to be able just to get up and go. So his liberty is restrained. Do you remember my question? I'm sorry. Do you remember my question to you? The accusatory questions? Right. Right. So what ends up happening is, Officer Rosamond asks Mr. Coleman, are there any narcotics in the car? I would argue that's an accusatory question. It's a question that seeks to elicit an incriminating response. If the officer believes that the question will elicit an incriminating response, that's an interrogation type of question, your honor. He asks, are there narcotics in the car? Are there any weapons in the car? Again, I would argue, given Rosamond's notion that what he is actually really doing at this point, he's conducting a drug investigation because, as the court has said in many, many opinions, weapons, guns, tools of the trade of drugs, are there narcotics? Are there weapons? Are there any large sums of money? Your honor, I can see that my time is dwindling here. I would say that those are accusatory questions. Let's hit the easy one. The district court said that Mr. Coleman volunteered the statement that he had $80,000 in the car. The reality shows in the trial transcripts at 732 that Officer Rosamond asks Mr. Coleman, how much money is it? And he responds specifically, your honor, question, I asked him, were there any narcotics in the vehicle? He answered no. I asked him if there were any weapons in the vehicle? He answered no. I asked him if there were any large sums of money? He told me no. All right. Did he tell you where it was? And I went into asking where, I'm sorry, he told me he always carried money. I went into asking where it was, was it on him, was it in the vehicle, and how much money was there? Clearly, he asked the question, wasn't volunteered, and then Mr. Coleman answers. He stated that it was in the vehicle, not on him. I started to initiate my search. I went back to him and asked him how much it was. I ran across it and he told me $80,000. So he did not volunteer the question. The argument is that he was in custody for these reasons, your honor. It started off as a traffic stop, yes, but it moved beyond a traffic stop, especially after the fact that there was a warrant. He was asked to step out of the car. He was patted down and searched. A backup officer came, Detective Greer, or Officer Greer, and then two more detectives came that were narcotics officers and Coleman's consent to a search. Your honor, he consented to the search, but at the time that he consented to it, these questions that were raised that elicited the answer from him as far as $80,000 were later used against him and the government's closing arguments to connect him to drug dealing specifically and that he was lying about how much money he was in there. So that response, that question, while he was in custody, I would argue, to an interrogation type of question, your honor, that's thought to elicit an incriminating response, was used against Mr. Coleman as key evidence in the case in the government's closing arguments. Your honor, I see that my time is up. You've saved time for rebuttal. Thank you. Thank you, your honor. Thank you, guys. Okay, Mr. St. John? Yes, your honor. Or do you prefer St. John? I'm a fifth generation native Texan, probably St. John, but when I went to England, they did say St. John, your honor, and I want to thank the court again for the privilege of presenting my position today. I know it's discretion with the court, and I want to thank Justice Graves, Smith, and others who do that. I had to argue a case yesterday in Fort Worth at 3 o'clock, and so I got in my truck and rushed to Houston so I could review this, and I want to thank you for your graciousness to give me this opportunity. More specifically, my argument to question one is really more of a fact-driven question. I know it's a tough thing for the court to determine, but I would suggest to the court that the government did not prove its case beyond reasonable doubt. More specifically, every cooperating witness who testified against my client, Mr. Herr, who was the target of the investigation, had something to gain. They all gained something. They all received a benefit from the government, which is allowed by law, and I understand that. And wasn't the jury told about that? Yes, your honor. They were instructed about that specifically, but I would suggest to the court that that didn't cure anything in terms of the harm to my client, but you're correct. They were instructed about that from Judge Crone from Beaumont, but if the court will indulge me, and I don't want to read everything that's involved in the record. I know the court can do that on its own, but I've tried enough of these cases where there's always concern, and I was not the trial lawyer, there's always concern regarding the believability and the credibility of the folks on trial, and I understand it falls within the province of the jury, but Williams testified that Herr stored trash bags full of marijuana in large amounts of cocaine and marijuana at her house, and there was some stuff found there, but nothing was found in Mr. Herr's house. There were some coins found in the fountain, I think $21,000, and that might shock the conscience of some folks, but my client did have a business. He had a moving business. His wife, who's here today, was a professional basketball player, actually played in the team, so the family had good income, so the notion that $21,000 of coins in a fountain would be booty from some type of drug sale I would suggest is not a valid argument that the government tried to make in front of the jury. Mr. Keith testified that Herr supplied him a total of 4,000 pounds of marijuana from 2004 through 2010, and he further testified Herr supplied him with approximately 20 to 50 kilograms of cocaine. I understand it's a conspiracy, and I understand also there's a conspiracy to distribute cocaine and marijuana. They searched Mr. Herr's home, Justice Graves. They didn't find any controlled substance. When the stop was made with, I think, Ms. Williams, I believe there was some money found, but nothing right back to him. I do know Mr. Coleman was stopped, and in his suitcase there was an exorbitant amount of cash. I believe it was $186,000, and of course Coleman is a co-defendant in this case today, and there was no testimony from him, but other folks tried to imply that all that cash was from my client. Brown testified that Herr had 14 kilograms at the time of cocaine unloaded from her house from a truck with Mexican plates. Where is the evidence that that actually happened? It's all inference, and it's all testimony from folks who had something to gain. Some of these folks were convicted felons. Some of these folks were looking at very severe federal sentences, and they received a benefit based on their testimony. Hall testified— Let me understand. Your argument in this connection is that the jury should not have found those witnesses credible witnesses? Yes. Yes, Justice Graves, absolutely. I think their credibility was very suspect. I know it falls within the province of the jury, but that's why, and I appreciate the court giving this, that's why I really think the court should review this issue regarding the jury's believability. I don't think . . . my point is I don't think Judge Crone's admonishment cured anything regarding their credibility and believability. We're not talking about one witness or two witnesses? No, you're not. Three witnesses? That's right. That's right. Or four witnesses? You're right. We're talking about five, aren't we? You're talking about different witnesses who . . . Four of whom were co-defendants. Yes, Your Honor. All of whom testified that they bought drugs from Heer, stored drugs at their house for him, substantial amounts of drugs. So that's five different people. And I don't . . . And your position is none of them should have been deemed credible by the jury? Absolutely. And that's where I started my argument. And I know it's a tough argument with the court, but . . . and that's why I prefaced it by saying this is going to be a tough argument because of five different folks testifying. But if you look at what they had to gain, I've had it happen before. I mean, folks . . . why? What was the kilogram total of marijuana? Judge, you'll have to go back and look at the . . . I believe it was over $41,000. Oh, yes, sir. It was a very significant amount. What base offense does that give you? The base offense . . . well, Mr. Heer's ultimately . . . and I have an argument in point two I could briefly address with the court. If we . . . we're not going to concede point one, but if the court doesn't go with that, I think my argument in point two is well taken. Let me move on to that because I don't want to run out of time. Use your own time. Well, I understand, Judge. I'm trying to get to the three different issues and I appreciate that. We don't concede . . . I think the guidelines changed. I think it was $36,000 and it went up to $38,000, but are you aware of that? Yes, sir. Yes, sir. If . . . if . . . if . . . what is true in terms of the amount of drugs, basically . . . it's in my brief and I'll just . . . from the point Mr. Heer submits that the court should discount entirely Mr. Keith's and Mr. Williams' uncooperative statements regarding cocaine, which amount is 118 kilograms of cocaine. Instead, the amount of cocaine attributable to Mr. Heer, if we concede point one, which we don't, should be 11 kilograms based on the currency seized and the traffic stops and that's the implication that the money found on Brown and Coleman was in fact related to Mr. Heer. Which would get you to what amount when it's converted into marijuana? The amount would be . . . if you convert it, it would be . . . I have it right here. Let's see. Marijuana equivalency, Your Honor, would be 11.44 kilograms of cocaine or 2,288 kilograms of marijuana. That would be the conversion. If I did my math correctly, which I think I did. So what I'm suggesting is if the court doesn't go with point one, which I understand, Justice is a tough, tough thing, I would ask the court to look strongly on argument two. Argument three is a constitutional argument and it was not raised at trial from the trial attorney. I wasn't the trial attorney and I can't change what someone did, but I would still suggest even with Mr. Heer's significant criminal history, that a life sentence for a drug offense is unconstitutional and violates the Eighth Amendment to the United States Constitution. There's a mention that he had a manslaughter conviction, but I don't think that was the final conviction. And those issues . . . the specific constitutional issue wasn't raised before the trial court, but I can still raise it today. Thank you for your time. All right. Thank you, Mr. St. John. You've saved time for rebuttal. Ms. Smith? Good morning, Your Honors. May it please the Court. I'll address briefly the sufficiency issue on both defendants, since that's what's addressed first in my brief. I don't think there's a question of sufficiency of evidence at all in this case. Mr. St. John brings up that we should discredit every witness. Our witnesses in drug cases are other people involved in the drug business. That's up to the jury to decide whether they're telling the truth. Of course, what's important about this case is that there were other things that corroborated with those witnesses testified to. For example, Kimberly Brown, as the jury was instructed in the jury instructions, if the jury believed her beyond a reasonable doubt, that's enough to convict both of them, based on the evidence presented in this case. However, there were several things that corroborated what she testified to. There were hotel records about the hotel she said they stayed in in Kentucky when they went to sell the cocaine. There were matching gas receipts that showed when the officers saw those two cars getting on and off the highway that they got gas at the same time, that Mr. Coleman paid for both of those gases and had the receipts in his possession. He also had a Galt House receipt in his possession that corroborated what Kimberly Brown said about how they went to Kentucky to sell the cocaine and came back with the money. It was her understanding, of course, that Mr. Coleman had all the money, but they actually both had a certain amount of the money. She said they went to Kentucky to sell 10 kilograms of cocaine. They had a total of approximately $300,000, and the testimony was that cocaine was going for about $30,000. That corroborates what she said. The jury could consider that, of course. It's the totality of the evidence. And then the numerous witnesses, as Judge Graves pointed out, there wasn't just one. There were four co-defendants. There were several witnesses that testified about Leonard Hare's drug dealing business. That's what he did. A lot. And no, we did not find any drugs in his house. The evidence was clear at trial that Mr. Hare had a business where he utilized his different girlfriends, there were three of them, who did not know each other until they were arrested on this case, used them to stash his drugs, used them to help sell drugs in Kentucky, used them to help sell drugs in Oklahoma. He kept his wife and his family separate, other than the fact of all the things that were found in his house. And the coins found in the fountain, right, it doesn't automatically all by itself say he's a drug dealer. A lot of people don't have $21,000 just sitting around in their fountain in front of their house. The point was, he had a lot of very expensive equipment and a lot of resources. Now, to go to Mr. Coleman's argument about the motion to suppress and the motion for a new trial. The key here is, Mr. Coleman was not in custody. Was he detained? Yes. He was not in custody. That's a difference in a traffic stop. What Officer Rosamond was doing was simply asking questions, continuously asking questions to confirm or dispel his suspicions of narcotic trafficking. Wesley, how long was the entire stop? I believe, well, I know it was about 18 minutes when he got consent, and then I think within the next 10 minutes or so they found the money. I was remembering about 30 minutes. Right. So I think total about 30 minutes from stop to finding the money. Of course, there's something going on all throughout that. Asking where he's coming from, well, actually asking both. Where are you coming from is certainly a question that can be asked at the beginning of a traffic stop. Coming from Tennessee, that alone is not incriminating. Mr. Ross makes the argument that he was not free to leave once they discovered the warrant. I think that's a little bit different twist on the cases that we usually see. It is. That's correct, Your Honor. I will say he did find out there could be a warrant, and he also testified that it was their procedure to confirm that warrant before they arrested. And that's when he said he was detained, at that point, so he could confirm that warrant. However, that was separate from the fact that he was still asking questions to confirm or dispel his suspicion that criminal activity was taking place. He had found the rental receipt in the vehicle, that it was a rental vehicle, but no rental contract, no rental agreement. Also, the person who rented the vehicle was not in the car. He found that suspicious. Of course, he had the information, which is allowable from the DPS officers, that had seen them traveling, seen the car they believed Hare traveling in and this white Explorer traveling together, getting on and off the highway together, getting gas together, things like that. So, he had that information. No rental agreement. Finds out about the warrant, which is a reason to keep him there, but still, he was not under arrest at that time. He was not free to leave. I think that's a different issue, but he was not detained. And this court, I filed a 28-J on Monday. The Ortiz case that came out March 18th, I listed factors that I thought were appropriate to this case. First of all, the length of questioning. It wasn't that long. These questions were going on, you know, throughout to confirm the suspicions. Also Close case. I think Judge Graves dissented in that case. That's correct. I agree with that, although Judge Graves also listed these factors. And the location of the questioning. That Ortiz case, in reading it, Ortiz was handcuffed. He was put in the back of the police car. It was a lengthy detention. Those questions were long. I mean, it sounded long. This whole thing, as Judge Smith pointed out, was 30 minutes. He was allowed to stand by the side of the road. There's a video. I know the court has a video. It's very hard to hear. But you can see that Mr. Coleman is just on the side of the road. He's got his hands free and able to just answer questions. Another factor, these questions were not accusatory in nature. These are questions that Officer Rosamond and his department and many police officers, as this court is aware, ask on the side of the road. When they're trying to confirm or dispel their suspicions about whether there's criminal activity going on. These are normal questions. Do you have any money? Do you have any drugs? Do you have any illegal contraband in your car? And what also is important about that is Mr. Coleman gave consent. It was after Mr. Coleman gave consent that Officer Rosamond said, how much money so I know what I'm looking for? Or where is it? How much money? And so it would have been discovered anyway. It wasn't $80,000. It was actually $186,000, which Mr. Coleman is not contesting and not trying to suppress. Of course, another factor was the amount of physical restraint. He wasn't physically restrained. He was standing on the side of the road. He was not free to leave, as the court points out. However, still not in custody, which is what makes the court's decision to allow the statements both during the trial and to deny the motion for a new trial correct, not an abuse of discretion and not error. As far as Mr. Hare's arguments about punishment, the amount of drugs that the court held him for the trial, there were in the PSR. That's what concerns me. The trial judge said I'm relying on the trial testimony, which supports the PSR's findings about the drug weight. Isn't that what the district court said? That's correct. She found the witnesses credible and relied on their testimony. Well, I guess my concern is my examination of trial testimony doesn't seem to substantiate every finding in the PSR regarding drug weight. You disagree? I do not disagree. However, what I think the court was doing is some of those findings in the PSR were, for example, CI1 is an Ike Keith. Now in the PSR, in some of the statements they reviewed for the PSR, in the trial he said he saw bags of drugs in Natasha Williams' garage. Well, the statements that were presented, the investigative statements that were given to the probation department actually had amounts listed out, which is how they got some of those amounts. And so I think what the court was doing is saying, because I believed these witnesses in trial, for example, in Ike Keith, I'm going to believe also what he put in his statement. There were also things like Kimberly Brown. What he said at trial was, is I saw bags. He doesn't know what was in the bags or what it weighed, and he didn't try to say what it was at trial. Isn't that right? That is correct. That did not come out at trial. That's true. And in reviewing this also, I don't believe, Kimberly Brown also testified that she, that 14 kilograms were unloaded at a time at her house. She did not give a certain number of times, although indicated it was more than one time were unloaded out of a truck, where she also saw two to three kilograms unloaded at a car dealership. Let me ask you, are you agreeing with me that the PSR's calculation of drug weight doesn't actually match up with trial testimony? It does not. There are other, there are other things used in the PSR that the court relied on. That's true. Well, isn't that significant though? I don't think. The district court seemed to be saying, I'm relying on the trial testimony, and the trial testimony supports everything that's listed in the PSR. Well, I think, I do think she relied on the trial testimony, but I think her point was she heard the witnesses at trial, and some of those witnesses had given statements which had more specific amounts listed in it. I think if you take what was said at trial, and then you, she also considered those statements that were presented to the probation department. I think if you add those, they're going to get you to at least 150 kilograms of cocaine, or 41,000, including the marijuana, when converted to 41,000 kilograms of marijuana. If you, if you figure that out. I think that's what the court was doing in that respect. I still think. And I guess the critical amount is 30,000, because in 30,000 he's subject to a life sentence. Exactly. It was a, it was a 38. If it's less than 30, then life is not within the guidelines range, right? I believe that's correct. Yes. It was three, because it went down. We had at the sentencing hearing, the courts read the transcript, I know, but we did go ahead and do the two point variance, because this came in between the time that they were considering reducing all the drug offenses by two points, and actually doing it. So there was a two point drop, actually, in the, the total offense level for Mr. Hare, which dropped him. He was actually going to be at a 44, but since a 43 is the highest, he was dropped down to a 42, which changed the range from just life to 360 to life. And the court then, of course, in the, in her reasoning for giving him a life sentence anyway, even though 360 was available, listed several reasons, articulated her position very well on why she wanted to go ahead with the life sentence. And that, that goes to the Eighth Amendment issue. You know, she talked about the jury finding, she talked about the fact that Mr. Hare was a leader organizer of this operation, that he was directing the activities of these different individuals who were assisting him in his drug distribution organization. She talked about the money that was found. She talked about the testimony of the witnesses, the items found at his house, the fact that one of the items found was a loaded firearm, the fact that she took into account his criminal history, which included a manslaughter conviction and two firearm convictions, all things which the court could reasonably consider in determining that this was a fair sentence, an appropriate sentence for Mr. Hare. Also, it was within the guidelines. And although the court doesn't have to follow the guidelines, that indicates, it's an indicator of proportionality. So it shows that there was no Eighth Amendment violation here. The court considered all the options. This was the punishment she thought was appropriate based on the evidence that she heard. So, to summarize, unless the court has other questions, just to summarize, the evidence was clearly sufficient here to convict Mr. Coleman and Mr. Hare. The statements made by Mr. Coleman on the side of the road were not made in custody. They were admissible. The court did not err. And essentially, based on the totality of the circumstances, we did argue in closing argument that he was untruthful. He was untruthful about the money that was in his car. He was trying to cover it up. However, the closing argument took into the whole totality of the evidence that was presented. The fact that they went to the hotel, the fact that Kim Brown said they went there to sell cocaine, the fact that they were traveling in tandem back, the fact that there was actually $186,000 in his car. The totality of the circumstances make these statements that Mr. Coleman is contesting not that significant in light of the totality of the evidence. And finally, the sentence for Mr. Hare was appropriate. The court based her decision based on what she heard at trial, based on the PSR and the probation's analysis of the evidence against Mr. Hare. And the sentence- Now tell me one more time now how I get to agree with you about drug weight calculations. She took- In spite of what the district court said. Right. Well, in spite of what the district court said or- The district court said the drug weight calculation is based on what's found in the PSR and I'm doing that because it's substantiated or corroborated by the trial testimony. Right. Which is not, which you've agreed with me is not exactly correct. Well it's not, it is correct, well I, I'm sorry, the trial testimony is correct, it's just not everything that the probation department had. You have to do some extrapolation to get from the trial testimony to where the PSR ends up. That's correct. That's correct. And I- Extrapolation is- I think that the court heard all the testimony, she understood the activity that Mr. Hare was doing, the amount of drugs he was distributing, the statements that she had that were included in the PSR were from either co-defendants who testified in the trial and had some more specific amounts or other co-defendants who did not testify in the trial. But based on the evidence she heard about Mr. Hare's activity, she felt it was believable based on what she heard at trial in Mr. Hare's activities. I think that's how she got to that amount and I think it's a reasonable assumption based on the fact that she heard how his drug trafficking organization worked, how much cocaine he was selling and marijuana he was selling and relied on those investigative statements, which I think courts are entitled to do. So some of the trial testimony corroborated pre-trial testimony which had been given by other witnesses who may not have testified at trial? Correct. All the witnesses did not testify. There's at least one CI listed in the PSR that did not testify, however, the court had access to that information. It was included in the PSR and it corroborated the drug trafficking activities of Mr. Hare. Thank you, Ms. Smith. Thank you. I appreciate your time. Mr. Ross, you've saved time for a bulletin. Thank you, Your Honor. I just want to correct two statements that the prosecutor made in regards to this case. She stated that Mr. Hare made the voluntary statement of $80,000 after the search had already occurred. And that is not borne out in the trial testimony. I'll address the court question. And did you ask him before you searched it if you would find anything in there? Counsel, the statements you're complaining about, were these statements used to prove any of the elements of the offenses at trial? The statements that he made during the traffic stop? I think that they were, Your Honor. I mean, they're used in essence to- Is what you say. Right. But throughout the course of trial, to elicit that testimony, they had the officer testify and they're laying the groundwork to be able to show that he had this money. He lied about it. It was $186,000 and that he was a drug dealer. And specifically, they argued to the jury, Your Honor, it says, let me be prosecution in closing- His statement wasn't that I have $186,000. His statement wasn't. That's what was found when it was searched. But it said, let me clear up a few things. Ms. Smith said during her portion, who would do this? And this is the other prosecutor talking. Who carries that kind of money? The answer was, nobody but drug dealers. Let me answer a few other questions. Nobody's making that kind of money in the restaurant business. And then they go on to say, nobody has $186,000. Nobody says to an officer, hey, I always carry cash, wouldn't leave it home without it. Yeah, I got 80 grand in the back. But, Your Honor, I see that my time is running out. Long and short of it is this, that he was in custody. There was a warrant. He was not free to leave. A reasonable person, under these circumstances, would not feel free to leave. And that's really the inquiry here. As Judge Graves, as you stated in Ortiz, that a suspect in custody for Miranda purposes, or you quoted, when a reasonable person is in the suspect's position, would have understood the situation to constitute a restraint on his freedom of movement to the degree which the law associates with a formal arrest. And then if I may just conclude with one point, Your Honor. The awareness of the person being questioned by an officer that he has become the focal point of the investigation may well lead him to conclude, as a reasonable person, that he is not free to leave and that he has been significantly deprived of his freedom. Your Honor, that's what occurred in this case. And then what happens is he's in custody, they're accusatory questions, he's answering them, it's a violation of his right, and the District Court erred in denying that motion to suppress. Your Honor. Thank you, Mr. Ross. Mr. St. John? Not to criticize the federal judge, because my great-grandfather was a federal judge before for 32 years, but I would suggest that Judge Crone did miscalculate the guidelines based on the PSR. And I know she doesn't make those up, but I don't think her justification, even though it's discretionary, is justified. I would still suggest that it's a violation of the Eighth Amendment. As Justice Graves, I can tell you read the record very comprehensively. As he pointed out specifically, there's just kind of loose testimony about drugs here, drugs here. And I would suggest the calculation was too severe and grossly disproportionate regarding, not to give up point one, but to concede, if there was a legally defining of sufficiency, beyond a reasonable doubt, based on this Court's ruling. I would suggest that you go back to the witnesses and their testimony. It's exacerbated, it's exaggerated. And I would still suggest to the Court that, and I know Judge Crone, I would still suggest to this Court that she missed the mark on that. Thank you. All right, thank you, Mr. St. John.